

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 2 0 2010 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SHAWN SOUTHERLAND,
CAROL VICKERS,

                Plaintiffs,

      – against –

DETECTIVE RICHARD GARCIA, New
York City Department, DETECTIVE PETER
CASTRO , New York City Department, THE
CITY OF NEW YORK,

                Defendants.

---

**MEMORANDUM, ORDER
& JUDGMENT**

09-CV-2230 (JWB)

**Appearances:**

Plaintiffs *Pro se*:

        Shawn Southerland
        235-695, loc C5E
        Hudson County Correctional Center
        35 Hackensack Ave.
        Kearny, NJ 07032

        Carol Vickers
        897 Empire Blvd., Apt. # B-2
        Brooklyn, NY 11213

For Defendants:

        Michael A. Cardozo
        Corporation Counsel of the City of New York
        100 Church Street, Room 3-216
        New York, New York 10007
        By: Max McCann

**JACK B. WEINSTEIN, Senior United States District Judge:**

1

## Table of Contents

I. Introduction ............................................................................................................... 2

II. Facts ......................................................................................................................... 3

   A. Custodial History ................................................................................................ 3

   B. "Search and Seizure" Claim .............................................................................. 6

      1. Search of Vickers Apartment ......................................................................... 6

      2. Search and Seizure of bag ............................................................................. 9

      3. Search of Vickers Vehicle ............................................................................. 10

III. Parties' contentions .................................................................................................. 11

IV. Relevant law and application .................................................................................. 12

   1. Summary judgement ........................................................................................... 12

   2. Search and seizure claims are barred by consent ............................................. 13

   3. Seizure and return of bag .................................................................................. 16

   4. False Arrest and imprisonment ........................................................................ 17

   5. Malicious prosecution ....................................................................................... 17

V. Conclusion .............................................................................................................. 19

## I. Introduction

Plaintiffs' *Pro se,* Shawn Southerland and his "aunt," Carol Vickers, a close family friend, sue New York City Police Detectives Richard Garcia and Peter Castro and the City of New York, pursuant to 42 U.S.C. § 1983 and New York State Law. They allege an illegal search of Vickers' apartment and car, and a seizure of a bag. Southerland also alleges false arrest, illegal imprisonment, and malicious prosecution; he seeks compensatory and punitive damages along with the return of "seized" property.

A non-evidentiary hearing was conducted. *See* Transcript of December 14, 2010. There is no merit to any of plaintiffs' claims.

## II.  Facts

### A.  Custodial History

Southerland is incarcerated in New Jersey pending trial for his alleged involvement in the murder of his late girlfriend, Christie Denise Neely.  The killing is believed to have occurred about April 3, 2007 in Bayonne, New Jersey.

He was arrested by Pennsylvania police in that state on October 14, 2008.  The contention of plaintiffs, supported by a decision in the Federal District Court for the Eastern District of Pennsylvania, is that this arrest was a violation of Southerland's Fourth Amendment rights -- pretextual in that the arrest was executed on a request of "New York Police." *See* plaintiffs' filing of 04/15/2009 - Exhibit D.  A New York warrant was issued one day after the arrest, on October 15, 2008.  *See* Declaration of Max McCann in Support of Defendants' Motion to Dismiss (hereafter referred to as "McCann Decl.") at Ex. B.

This plaintiff was indicted in abstentia on November 6, 2008 in the Bronx for the Neely murder.  *See id.* at Ex. C.  He was then arrested while he was in custody in Pennsylvania on a fugitive of justice warrant issued in New York on or about October 23, 2008.  *See* Second Amended Complaint (hereafter referred to as "Compl.") ¶ 7.  He was served with a New York Governor's warrant of extradition on January 14, 2009.  *Id.* ¶ 8.  After refusing to waive extradition, on February 11, 2009 he was ordered extradited.  *Id.* ¶ 9.  Defendants Garcia and Castro transported Southerland from a Pennsylvania jail to New York where he was arraigned on February 18, 2009.  *Id.* ¶¶ 10-21.

While still in New York State custody, he was indicted by the State of New Jersey on September 29, 2009 for the murder of Neely in New Jersey (along with charges of destruction of evidence and giving false information to an officer). *See* McCann Decl. at Ex. D.

On January 5, 2010, the New York Indictment was dismissed based on the district attorney's admission of a lack of geographic jurisdiction. *See* Plaintiffs Filing of July 14, 2010 – Ex. B (letter from Assistant Attorney General). Southerland claims to have been held illegally in New York for 458 days. *See* Compl. ¶ iv. From February 12, 2009 until June 4, 2010 Southerland was in custody at Rikers Island, New York.

While in a New York jail he was rearrested on January 12, 2010 based on the New Jersey Indictment. *See* Compl. ¶ 71. Southerland opposed his extradition to New Jersey. On April 14, 2010 he was served with a New York Governors' warrant, on request of the Governor of New Jersey. He filed an appeal in New York which was denied on his papers, without the benefit of a hearing, on May 26, 2010. A New York judge granted a stay of extradition until June 7, 2010. Plaintiff then filed a habeas corpus petition in the Appellate Division, First Department. On June 4, 2010 a New Jersey sheriff took custody, with permission of a New York judge, and transported Southerland to the Hudson County Correctional Center, New Jersey, where he has since been held. On August 6, 2010 the Appellate Division, First Department, New York, denied the writ, relying on the fact that petitioner was no longer held in New York.

Southerland was arraigned and pleaded not guilty in New Jersey on June 21, 2010. This murder case is still pending. He remains in custody in New Jersey.

The history of the litigation is summarized as follows:

| Date | Event |
|------|-------|
|      |       |

| | |
|---|---|
| April 3, 2007 | Christie Denise Neely was believed to have been murdered in Bayonne, New Jersey. |
| October 14, 2008 | Southerland was arrested in Pennsylvania by Pennsylvania police. |
| October 15, 2008 | While he was in Pennsylvania custody, a New York warrant was issued for Southerland's arrest. |
| October 23, 2008 | A New York fugitive of justice warrant was served in Pennsylvania. |
| November 6, 2008 | A New York Indictment was issued in abstentia for Southerland. |
| January 14, 2009 | A New York Governor's warrant of extradition was served on Southerland while he was in Pennsylvania custody. |
| February 11, 2009 | Southerland was ordered extradited to New York. |
| February 12, 2009 | Southerland was taken to New York by the detective defendants. |
| February 12, 2009 - June 4, 2010 | Southerland was at Rikers Island, New York in custody. |
| February 18, 2009 | Southerland was arraigned in Bronx County Criminal Court. |
| May 21, 2009 | Southerland and Vickers filed a civil rights complaint in this federal court, 09cv2230. |
| September 29, 2009 | Southerland, while in custody in New York, was indicted by the State of New Jersey. |
| October 19, 2009 | A New Jersey detainer was lodged against Southerland in New York custody. |
| January 5, 2010 | The New York Indictment was dismissed on motion of the Bronx District Attorney. |
| January 12, 2010 | Southerland was arrested on the New Jersey indictment in New York. He declined voluntary extradition to New Jersey and filed a petition for a writ of habeas corpus in New York. |
| April 14, 2010 | Southerland was served with a New York Governors' warrant on behalf of the Governor of New Jersey. |
| May 26, 2010 | Southerland's motion in opposition to extradition was denied on papers without a hearing. A New York judge stayed the matter until June 7, 2010. Southerland filed a habeas corpus petition in the Appellate Division. |
| June 4, 2010 | A New Jersey sheriff took custody of Southerland with the permission of a New York judge and transported him to the Hudson |

| | |
|---|---|
| | County Correctional Center, New Jersey, where he has since been held. |
| June 21, 2010 | Southerland was arraigned in New Jersey; he pleaded "not guilty." |
| August 6, 2010 | The First Department of the Appellate Division, denied the writ of habeas corpus since Southerland was no longer held in New York. |
| December 14, 2010 | Southerland is incarcerated in New Jersey awaiting trial. A hearing on motions for summary judgement by all parties was conducted in this court. |

B. "Search and Seizure" Claim

1. Search of Vickers Apartment

Vickers is Southerland's close family friend. Her deposition ("Vickers Depo.") at 17. He refers to her as "aunt." *Id*; *See* also Compl. ¶ 41. Occasionally Southerland stayed overnight at her apartment. He claims to have slept in Vickers' apartment on April 9, 2007. *See* Compl. ¶ 41.

Based on Vickers' recollection, defendant detectives made three visits to Vickers' apartment. *See* trans. Dec. 14, 2010. The first was about 2:00 pm about April 9, 2007. No entry or search was conducted during this first visit because Vickers was not home. They interviewed a neighbor who works in law enforcement. He is not a defendant in this action.

Later, the night of the first visit, at approximately 10:00 p.m. detectives Garcia and Castro, returned to the Vickers' residence. Their guns were not drawn, but their shields were displayed. Vickers granted consent to enter. *See* Compl. ¶ 38; Vickers Depo. at 40. The detectives were informed by Vickers that Southerland was away in Long Island visiting his sister; they were given his sister's contact information. *See* Plaintiffs Opposition to Defendants' Motion for Summary Judgement (hereafter "Plaintiffs Opposition") at 8.

They searched the foyer and living room. *See* Vickers Depo. at 45.

Defendants returned the next afternoon. *Id.* They did not show their shields or guns. *Id.* at 50. Vickers testified that they asked her if she helped Southerland kill Christy Neely, *Id.* at 48, but that they might have been sarcastic. *Id.* She voluntarily provided specific information as a result of her neighbor's advice. The nature of the visit by the detectives is described by her as follows:

> Q. When the two detectives arrived at your house later in the week on this occasion, did they threaten any action if you refused to allow them to come into your house?
> A. No, because I never refused to allow them to come into my house.
> Q. Could you have told them that they were not allowed to come into your house?
> A. No.
> Q. Why do you say that?
> A. Because of what my neighbor told me. My neighbor told me that I needed to cooperate.

Vickers Depo. at 52.

> Q. What are your claims against Detective Garcia in this suit?
> A. Well, neither one of them showed me a warrant. I let them in because my neighbor told me to. I trust my neighbor. He's been on the Nassau County Police Department for quite a number of years. I've never had problems with him. We're like family.

Vickers Depo. at 67-68.

> Q. Did you allow the detectives to look around your apartment?
> A. I certainly didn't tell them no, they couldn't. They didn't ask. They just walked.
> Q. Did you ever tell the detectives to leave your apartment?
> A. No.

Vickers Depo. at 72.

> Q. [Why are]you suing Detective Richard Garcia?
> A. Because he didn't treat me right when he came to

my house. I mean don't walk around and accuse. I thought
when a police officer comes to search your house, they're
supposed to hand you a piece of paper. I have a warrant to
search. Not walk around.
Q. Do you allege that Detective Richard Garcia
searched your apartment?
A. I'm not sure which one it was. As I said, one
was a nice guy and the other one was quite rude. I mean I
would have let them in the beginning. I have nothing to
hide. I had nothing to do with Christy Neely's death,
nothing at all.

Vickers Depo. at 68.

Q. Did Detective Richard Garcia enter any other
rooms besides the foyer in your apartment?
A. Well, if it was Detective Richard Garcia, he
entered every room in my apartment.
Q. Sorry, did the friendly detective enter any other
rooms besides the foyer in your apartment?
A. No, it wasn't the friendly one. It was the
non-friendly detective.

Vickers Depo. at 71.

Q. Did the detectives enter any room other than the
foyer, on the occasion that they came to your house and
told you that they had found the body?
A. Yes, they went into Terrell Southerland's
bedroom. They looked in my closet in the foyer, which is
the walk-in closet. They looked in my bedroom.

Vickers Depo. at 55.

Q. Did they ask you if they could look around your
apartment?
A. No.

Vickers Depo. at 55.

Q. Do you recall anything else that the detective
touched in your living room?
A. No.
Q. Did the detective enter another room after the
living room?
A. Yes.
Q. Which room?
A. He wanted to know whose room were back there, and
I told him Terrell Southerland and mine.
Q. Did he enter into one of those rooms?
A. Yes.

```
Q. Which room did he enter?
A. He went into Terrell Southerland's room. He
looked in the linen closet, which I told him, I said all
that's in there is linen. Nobody can hide in there. It's
not big enough.
Q. Was that closet locked at the time?
A. No, I have no locks on nothing in my house other
than my safe.
Q. Was the detective looking for Shawn Southerland?
A. I assume so.
What else could he been looking for?
Q. Did the detective touch anything else in Terrell
Southerland's room?
A. I don't believe so.
Q. Did he enter another room after that?
A. Yes, my bedroom. He just looked around.
Q. Did he touch anything in your bedroom?
A. No.
Q. Then he left the bedroom?
A. Yes, and came back to the foyer.
```
Vickers Depo. at 58-9. *See also* Transcript of hearing, December 14, 2010.

According to the plaintiffs, consent was limited to the detectives entering in order to speak with Ms. Vickers. *See* Plaintiffs' Opposition at 28. Defendants' view is that consent was given to conduct a "cursory search" of her home. *See* McCann Decl. at Ex. E ¶ 4.

Vickers claims she never indicated anything other than that they could come into the apartment; she never objected to their actions. *See* Supplemental Declaration of Max McCann in Support of Defendants' Motion for Summary Judgement ("Supp. McCann Decl.") at Ex. F at 40, 55, 72. Her deposition testimony indicates that she believes the detectives looked through every room without objection. *See Id.* at 71.

2. Search and Seizure of bag

On April 10, 2007, at 10:35 pm, Vickers gave written consent to remove from her home a bag she owned that she had lent to Southerland and that contained his personal effects. *See* Supp. McCann Decl. at Ex. G. The document stated: "I, Carol Vickers, date of birth, 3/9/47,

give Detective Castro permission to remove a duffle bag with clothes from my home, 897

Empire Boulevard, apartment B-2. [Vickers signature], 10:30 p.m., April 10, 2007." Vickers

deposition explains the circumstances:

> Q. Did the detectives ask you if Shawn Southerland
> left any property in your apartment?
> A. Yes.
> Q. Is this when they were still standing in the
> foyer of your apartment?

Vickers Depo. at 52.

> A. I found a brown -- well, a tan duffle bag that I
> lent him and I gave it to them.
> Q. Where did you find this duffle bag?
> A. In my living room, up in the corner.
> Q. What happened next?
> A. They looked through it I believe and asked me
> could they take it. I said sure.

Vickers Depo. at 53.

> Q. Where in the living room was the bag located?
> A. Up in the corner.
> Q. Which corner?
> A. By my couch.

*Id.*

3. Search of Vickers Vehicle

Ms. Vickers voluntarily drove her car to the police precinct stationhouse to be inspected

by the police. The car had been used from time-to-time by Southerland. The detectives contend

that they did not seize or ask Vickers to produce her vehicle for inspection. *See* McCann Decl. at

Ex. E ¶ 5. Plaintiffs dispute this contention. *See* Compl. 49; *See also* Supp. McCann Decl. at

Ex. F at 59.

> Q. What happened next?
> A. They asked about my car. And I told them, yes,
> Shawn drove my car. And they said well, we're going to
> have to take your car for fingerprints. And I agreed.
> Q. Did they ask you to drive your car to a location?
> A. Yes, to the 71st Precinct. And they followed me.

Vickers Depo. at 59.

III.    Parties' contentions

The police had no warrant or consent to search Vickers' home or car. Any consent given to the police was limited, plaintiffs assert, to speaking to Vickers. They claim that Vickers did not know that she had the right to refuse so that any "consent" could not be "voluntary." Alternatively, they argue that if there was a limited consent, it was gained by "a show of authority," through duress and coercion. They note that the police did not obtain written consent to search the car even though they did request such permission to remove the bag from the apartment. *See* Plaintiffs' Opposition at 29.

Southerland argues that the police coerced Vickers into producing "his" duffel bag. He claims that the police committed a Fourth Amendment and Due process violation in searching the apartment and car, and in seizing the bag. In support he argues that he needed to give his own permission, Comp. ¶ 43; that the detectives never gave him a receipt or a voucher; and that the bag was never inventoried. *See* Compl. ¶¶ 43-44, 90-91; Plaintiffs' Opposition at 5. Both plaintiffs charge that the police cannot be granted qualified immunity on these facts, and that the city should be held liable on municipal liability grounds.

It is defendants' contention that under the circumstances the detectives had a reasonable belief that Vickers was cooperating since she did not protest, and that her actions were indicative of consent to what was a limited "cursory search." Alternatively, they argue that their search was a permissive protective sweep; the officers deserve qualified immunity; and, in any event, plaintiffs have not made out a claim for municipal liability.

Southerland also argues that he was falsely arrested, imprisoned, and maliciously prosecuted. Defendants counter that since his arrest was executed pursuant to a facially valid warrant there

can be no false arrest or false imprisonment and that any malicious prosecution claim must fail because plaintiff has not received a favorable determination of the murder charge.

## IV.    Relevant law and application

### 1.  Summary judgement

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004). Relief is warranted when after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *see Anderson,* 477 U.S. at 247-50, 255; *Sledge v. Kooi,* 556 F.3d 137, 140 (2d Cir.2009). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P.R. 56(e). "Mere conclusory allegations, speculation, or conjecture" will not suffice. *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990).

Plaintiffs' pleadings are read and interpreted liberally since they are proceeding *pro se. See McPherson v. Coombe,* 174 f.3d 276, 280 (1999) ("we read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'"). "However, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to

12

overcome a motion for summary judgment. *See Lee v. Coughlin,* 902 F.Supp. 424, 429

(S.D.N.Y.,1995) citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991).

2. Search and seizure claims are barred by consent

Consent renders a search reasonable. *See United States v. Garcia,* 56 F.3d 418, 422 (2d

Cir. 1995). "To ascertain whether consent is valid, courts examine the 'totality of all the

circumstances' to determine whether the consent was 'a product of that individual's free and

unconstrained choice, rather than a mere acquiescence in a show of authority.'" *Id.* "It is also

well established that the concept of knowing and intelligent waiver, which is strictly applied to

rights involving a fair criminal trial, does not govern in the Fourth Amendment context." *Id.*

"So long as the police do not coerce consent, a search conducted on the basis of consent is not an

unreasonable search." *Id.* "Therefore, knowledge of the right to refuse consent is not a

requirement to a finding of voluntariness. . . ." *Id.* "Such lack of awareness is germane only if

it resulted in a consent to entry that was 'the product of duress or coercion,' and the officers as a

result did not have a 'reasonable basis for believing that there had been consent to the search.'"

*Id.* at 424. (citations omitted).

"The Fourth Amendment is satisfied when, under the circumstances, it is objectively

reasonable for the officer to believe that the scope of the suspect's consent permitted him to

[conduct the search that was undertaken]." *Id.* at 423.

> [A]n objective view of whether the officers had a reasonable basis to perceive
> such an invitation (or, more precisely, the consent thereby implied) *is* the issue.
> Further, it is irrelevant whether an invitation to enter also comprehended an
> invitation 'to search the house'. . . . Nor does the presence of three law
> enforcement officers lend significant support to a claim of coercion. Consent to a
> search has been found despite formal arrest. . . . and such additional aggravating
> circumstances as handcuffing of a suspect, the presence of six law enforcement
> officers in his home, and their assurance that they would remain indefinitely and
> secure a search warrant if consent were withheld.

13

*Id.* "Consent can be found from an individual's words, acts or conduct." *Id.* at 424.

It is not clear which party bears the burden of proving consent. *See Tirreno v. Mott,* 375 Fed.Appx. 140 (2d Cir. 2010) ("the law of this Circuit is not clear in assigning the burden of proof regarding consent in a § 1983 action for unlawful search."). Since the evidence overwhelmingly favors defendants it does not matter who has the burden of proof.

In the instant case Vickers concedes that she consented to the detectives' entry into the apartment. Fear that a lack of cooperation would result in her losing her city transit job and pension does not negate consent for purposes of this civil case. *See* Plaintiffs' Opposition at 14-15; Vickers Depo. at 9, 11-2. She does not allege that the detectives said or implied anything leading her to be in fear. Instead, she blames her concern on a neighbor's warning to cooperate. That neighbor was not acting in cooperation with the police.

Coercion and duress are lacking. Vickers cooperated and did not protest any of the detectives' actions. She provided explicit verbal consent to at least some of the detectives' actions. For example, according to Vickers' deposition, she voluntarily agreed to produce the car to the 71st Precinct for inspection.

> "They asked about my car. And I told them, yes,
> Shawn drove my car. And they said well, we're going to
> have to take your car for fingerprints. And I agreed."

Vickers Depo. at 59.

She consented to seizure of the duffel bag, which had been left in her apartment with no limitations on her right to dispose of it. She even provided written consent for its removal.

Throughout Vickers' encounters with the detectives she was cooperative. *See* Plaintiffs' Opposition at 10. She concedes that she voluntarily consented to be fingerprinted on two

14

occasions. Moreover, she voluntarily went to the 71st precint on three occasions, first to drop off

her car and get fingerprinted, the second time, to be re-fingerprinted, and a third time, to pick up

her car. *See* Transcript of hearing held December 14, 2010.

In the alternative, defendants argue that their actions in looking around the apartment

amounted to a permissive *"Buie"* "Protective sweep." *See Maryland v. Buie,* 494 U.S. 325 at

327 (1990) (allowing a protective sweep, to stop a potential ambush by searching for unseen

third parties). While this would be another basis for dismissal of plaintiffs' claims, defendants

have not presented enough facts to support this defense. All that is before the court on this point

is this exchange:

```
Q. Did he enter into one of those rooms?
A. Yes.
Q. Which room did he enter?
A. He went into Terrell Southerland's room. He
looked in the linen closet, which I told him, I said all
that's in there is linen. Nobody can hide in there. It's
not big enough.
Q. Was that closet locked at the time?
A. No, I have no locks on nothing in my house other
than my safe.
Q. Was the detective looking for Shawn Southerland?
A. I assume so.
What else could he been looking for?
```
Vickers Depo. 58-9.

Here the *"Buie"* issue need not be addressed since consent was given. *Cf. United States*

*v. Gandia,* 424 F.3d 255, 262 (2d. 2005) (refusing to sanction a protective sweep when law

enforcement enters based on consent, absent factual support that the police had reason to believe

that they needed to protect themselves).

Since it was Vickers car and apartment, she had implied authority to consent to search

even through Southerland's possessions may have been in her custody, *see U.S. v. McGee,* 564

F.3d 136, 139-140 (2d. Cir. 2009) ("[S]uch a person [described as a "third party"] validates a search by giving the authorities consent to search 'if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access.'").

Consent was given to the detectives. There are no search and seizures violations involving the search of the house, the car, or seizure of the duffel bag. Summary judgement on these claims is warranted.

Even if Vickers' consent had not been given, there is enough evidence that the detectives had an objectively reasonable belief that consent was given. This case passes the threshold required for qualified immunity. *See Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)) ("Under federal law, a police officer is entitled to qualified immunity where . . . it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." ). Since Plaintiffs' assertions cannot implicate "custom or policy" regarding defendants' actions, they do not constitute a viable claim of municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

Summary judgement is warranted in favor of defendants on the search and seizure claims.

3. Seizure and return of bag

If the belongings are no longer required by the police, they will be returned. *See* Transcript of hearing of December 14, 2010 (concession of counsel for City of New York). There is no basis for an order directing return of this item. Plaintiff is advised to file the appropriate request with the District Attorney's Office for return of the bag seized.

### 4. False Arrest and imprisonment

The elements of a claim of false arrest under section 1983 are substantially the same as those for false arrest under New York law. *Jenkins v. City of New York*, 478 F.3d 76, 83 (2d Cir. 2007). *See also Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). "The common law tort of false arrest is a species of false imprisonment, an action 'derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement.'" *Singer*, 63 F.3d at 118 (quoting *Broughton v. State*, 373 N.Y.S.2d at 93, 335 N.E.2d at 314 (1975). This claim is distinct from one of malicious prosecution: "each protects a different personal interest and is composed of different elements." *Id.* Under New York law, the elements of a false imprisonment claim are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer*, 63 F.3d at 118.

Since Southerland's arrest was executed pursuant to a warrant valid on its face, it and the confinement, were privileged. *See Sclafani v. Spitzer*, --- F.Supp.2d ----, 2010 WL 3386022 at *12, (E.D.N.Y., 2010). "When an unlawful arrest has been effected by a warrant an appropriate form of action is malicious prosecution, not false arrest." *Id.* quoting *Broughton v. State*, 37 N.Y.2d 451, 457-58, 373 N.Y.S.2d 87, 94  335 N.E.2d 310, 314-15 (N.Y.1975).

There is no ground for a claim of false arrest and imprisonment.

### 5. Malicious prosecution

The elements of a malicious prosecution claim under New York state law are: (1) the defendant commenced or continued a criminal proceeding against plaintiff; (2) the proceeding terminated in plaintiff's favor; (3) there was no probable cause for the proceeding; and (4) the

defendant initiated the criminal proceeding out of malice. *See Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir.1994).

There are two relevant claims of malicious prosecution. The first is that the New York warrant and indictment for murder were malicious in that there was no probable cause for criminal proceedings against Southerland. The second claim is that New York authorities "commenced or continued" the case even though geographic jurisdiction was evidently lacking. This contention is based on the period that Southerland spent in New York custody between the issuance and execution of the New York warrant (February 12, 2009) and the issuance of the New Jersey indictment (September 29, 2009).

Since plaintiff must show that "the proceeding terminated in plaintiff's favor," he cannot proceed. If a new proceeding has in fact been commenced, a plea that the malicious prosecution action is premature will be sustained. *See Weglein v Trow Directory, Printing & Bookbinding Co.*, 152 A.D. 705, 137 N.Y.S. 556 (N.Y.A.D. 2d Dept. 1912). The Court of Appeals for the Second Circuit in *Rothstein v. Carriere*, 373 F.3d 275, 287n4 (2d Cir. 2004) has noted that:

> The New York Court of Appeals has repeatedly cited the Restatement § 660 with approval, as has this Court when applying New York law in malicious prosecution cases. *See, e.g., Smith-Hunter*, 95 N.Y.2d at 195-98, 712 N.Y.S.2d 438, 734 N.E.2d 750; *Murphy v. Lynn*, 118 F.3d 938, 947-49 (2d Cir.1997).

The Restatement, Second, Torts § 660(d) states:

> A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if . . . new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.

And comment (g) reads:

Thus the abandonment of criminal proceedings is not a termination in favor of the accused if they were abandoned for the purpose of bringing other proceedings for the same offense and other proceedings are thereafter instituted within a reasonable time. Such an abandonment may occur when the private prosecutor ascertains that the proceedings have been brought before a tribunal having no jurisdiction or only doubtful jurisdiction over the matter, or when a complaint has been imperfectly drawn and the proceedings are abandoned in order to permit the filing of a new and amended complaint.

Because a prosecution for the same allegations have been commenced in the State of New Jersey, this cause of action is not ripe for adjudication. The proceeding has not terminated in favor of plaintiff. *See Thompson v. Delvalle,* Slip Copy, 2010 WL 2505638 (S.D.N.Y.,2010) ( "Plaintiff concedes that these two prosecutions stem from the same set of events. . . Indeed, the State prosecution was dismissed only after the Federal prosecution was commenced. . . because the Federal and State actions are inextricably intertwined and substantially related to one another.")

Since New York authorities merely closed their case because of a lack of jurisdiction and the extradition and prosecution of the New Jersey authorities--who had proper jurisdiction--went forward, plaintiff Southerland has never had the criminal proceeding terminated in his favor. His claim is not ripe for adjudication. It should be dismissed.


V.    Conclusion

Summary judgement is granted to all defendants on all of Plaintiffs' claims. Summary judgement is denied to plaintiffs.

The pro se clerk of the court shall assist if either plaintiff wishes to prosecute an appeal. They are granted leave to appeal in forma pauperis.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   November 15, 2010
        Brooklyn, New York